# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DARREN V. MICHAEL,
    Plaintiff,

v.

MARSHA BLACKBURN, *in her Individual capacity and as United States Senator*,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Case No: _____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

**JURY DEMAND**

## COMPLAINT

Plaintiff, Darren Michael, submits this Complaint, through his counsel Meggan B. Sullivan and David L. King, against Marsha Blackburn, individually and in her capacity as United States Senator.

## INTRODUCTION

1. This action arises from Defendant's unlawful use of governmental authority to suppress Plaintiff's constitutionally protected speech through coercive threats and intimidation. Defendant, acting under color of state law and wielding the power of the United States Senate, engaged in a calculated campaign to punish Plaintiff for expression she and the government disfavored by threatening adverse action against his employer and creating a system of prior restraint that chilled Plaintiff's exercise of First Amendment rights.

2. Defendant's conduct crossed the constitutional line separating permissible governmental persuasion from impermissible coercion. Through public statements, private correspondence and private meetings, Defendant conveyed explicit and implicit threats that unless Plaintiff's employer

took adverse action, Defendant would deploy the coercive power of the state to impose sanctions, initiate enforcement proceedings, or otherwise inflict adverse consequences upon Plaintiff's employer.

3. Defendant's communications were not mere expressions of opinion or attempts to persuade. Rather, they constituted threats of government action designed to compel compliance through fear of official punishment. The context, tone, word choice and substance of Defendant's statements—viewed together with Defendant's regulatory authority over Plaintiff's employer and the credible threat of adverse action—establish that a reasonable person in Plaintiff's employer's position would have understood Defendant's conduct as an ultimatum backed by state and federal power, not a request subject to voluntary consideration.

4. Defendant possessed and invoked substantial regulatory authority over Plaintiff, including the power to initiate investigations of APSU and decrease federal funding. Defendant explicitly or implicitly referenced this authority in communications with Plaintiff's employer, making clear that noncompliance would trigger the exercise of governmental power against Plaintiff's employer's interests.

5. Defendant's threats had their intended effect. Faced with the credible prospect of decreased federal funding, Plaintiff's employer removed the speech and complied with Defendant's command, not out of voluntary agreement with Defendant's viewpoint, but because Defendant left no reasonable alternative short of incurring severe government-imposed harm.

6. The conduct alleged herein constitutes viewpoint discrimination and prior restraint in violation of the First Amendment to the United States Constitution. A government official may not do indirectly what the Constitution forbids directly: coerce a private party into suppressing disfavored speech by threatening to wield regulatory or enforcement authority unless the party

complies. Defendant's actions bear the hallmarks of unconstitutional coercion identified by controlling precedent, including the invocation of regulatory power, threatening language, perception of the communication as a threat, and express or implied reference to adverse consequences for noncompliance.

7. This complaint seeks declaratory and injunctive relief, compensatory and punitive damages and such other relief as the Court deems just and proper to remedy the deprivation of Plaintiff's constitutional rights and to prevent future violations.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over Plaintiff's federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) which confer jurisdiction over civil actions arising under the Constitution and laws of the United States and actions to redress deprivations of constitutional rights under color of state law. Plaintiff asserts claims under the First and Fourteenth Amendments to the United States Constitution, enforceable through 42 U.S.C. §§ 1983 and 1988. The case also presents questions arising under Article I, Section 19 of the Tennessee Constitution.

9. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. 1367(a) because those claims form part of the same case or controversy as Plaintiff's federal constitutional claims.

10. The Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the Middle District of Tennessee. Defendant directed her public communications at Austin Peay State University, a public institution located in Clarksville, Tennessee, within this district. The adverse employment

actions that form the basis of this action occurred at Austin Peay State University within this district. Plaintiff resides in Montgomery County, Tennessee, which lies within this district.

## PARTIES

12. Plaintiff Darren Michael is an adult resident of Montgomery County, Tennessee. At all times relevant to this Complaint, Plaintiff was employed as a tenured Professor of Theatre in the Collect of Arts and Letter at Austin Peay State University, a public institution of higher education in Clarksville, Tennessee.

13. Defendant Marsha Blackburn is a United States Senator representing the state of Tennessee. She is sued in her individual capacity and as United States Senator. At all times relevant to this Complaint, Defendant acted under color of state law and is a "person" within the meaning of 42 U.S.C. § 1983 by exercising authority, influence, coercive power of her federal office to induce state actors at Austin Peay State University to take retaliatory adverse employment actions against Plaintiff because of his protected speech. Defendant resides in Tennessee and the acts giving rise to this action occurred within the Middle District of Tennessee. She is sued in both her official and individual capacities.

## FACTS

### A. PLAINTIFF'S EMPLOYMENT AND ACADEMIC RECORD

14. Plaintiff has been employed as a Professor of Theatre at Austin Peay State University (APSU)'s College of Arts & Letters since 2007, serving the institution for more than 19 years.

15. Plaintiff is a tenured full professor. Tenure affords Plaintiff both procedural and substantive protections against termination, including the right to notice, a hearing and termination only for adequate cause as defined by APSU policies.

16. Throughout his tenure, Plaintiff has maintained an exemplary professional record. His performance evaluations consistently reflect strong teaching, scholarship and service. He is widely regarded as a respected and valued member of the APSU academic community.

17. Plaintiff has played a significant role in developing APSU's Theatre program into a department of academic quality and community engagement.

18. Plaintiff has served in leadership roles within APSU, including President Elect, and subsequently President of the Faculty Senate, a position of trust and responsibility within he university's shared government structure. .

19. Plaintiff's spouse is also employed by APSU as an administrator responsible for accreditation compliance and regularly interacts with university leadership.

20. Plaintiff and his spouse also have a minor child who resides with them in Montgomery County, Tennessee.

**B. THE PUBLIC DISCOURSE SURROUNDING GUN VIOLENCE AND THE CHARLIE KIRK KILLING**

21. On September 10, 2025, political commentator Charlie Kirk, was killed by gunshot while speaking publicly at Utah Valley State University in Orem, Utah.

22. Mr. Kirk was a prominent public figure known nationally for expressing conservative political views on numerous matters of public concern, including gun rights, the Second Amendment and gun violence in America.

23. Prior to his death, Mr. Kirk had publicly stated his view that gun deaths in America were an unfortunate but acceptable cost of preserving Second Amendment rights. Specifically, Mr. Kirk stated: "I think it's worth it. I think it's worth [it] to have a cost of, unfortunately, some gun deaths every single year so that we can have the Second Amendment to protect our other God-given rights.."

24. Mr. Kirk's death by gun violence sparked intense public discourse, outrage, and grief across American society. Millions of messages, posts, and comments were shared online and through social media platforms addressing the irony, tragedy and broader implications of his death in light of his prior public statements on gun violence.

25. The shooting death of Mr. Kirk was a matter of significant public concern, particularly in Nashville, Tennessee, which had recently experienced the mass shooting at The Covenant School on March 27, 2023, in which a gunman killed six people, including three nine-year-old children.

## C. PLAINTIFF'S PROTECTED SPEECH

26. Plaintiff maintained a personal, private Facebook account that he used to communicate with friends, family and acquaintances in his capacity as a private citizen.

27. On or about September 11, 2025, Plaintiff shared a post on his private Facebook account commenting on Mr. Kirk's death in relation to Mr. Kirk's prior public statements on gun violence. The post consisted of a screenshot of a news headline quoting Mr. Kirk's own words which stated:

"Charlie Kirk Says Gun Deaths 'Unfortunately' Worth it to Keep 2nd Amendment." *See* Exhibit No. 1, Michael Post.

28.     Plaintiff's post addressed a matter of profound public concern for the Nashville community as Mr. Kirk's original post was after the mass shooting which killed six children and school staff at Covenant School in Nashville. The post engaged with Mr. Kirk's own publicly stated views and invited reflection on the costs of gun violence, public safety, and the tragic irony of a prominent commentator's death by the very violence he had publicly defended.

29.     While Plaintiff's post was particularly salient to the Nashville community, where the Covenant School shooting had occurred earlier, Mr. Kirk's original statement had been made in the aftermath of that mass shooting, which killed nine people, including young children and school staff.

30.     Plaintiff's Facebook post was made on his personal, private social media account. It was not made in the course of his official duties as a professor, did not involve his teaching responsibilities, did not reference APSU and was not connected to his employment in any way. Plaintiff spoke as a private citizen on a matter of public concern.

31.     Plaintiff's post did not disrupt his teaching, interfere with his professional responsibilities, compromise his relationship with students or colleagues or cause any disruption whatsoever at APSU prior to Defendant's public intervention.

**D.     THE FABRICATED "MOSAIC" POST**

32.     Without Plaintiff's knowledge or consent, a former student accessed Plaintiff's Facebook post and combined it with other unrelated content to create a misleading and defamatory "mosaic" post that falsely purported to represent Plaintiff's views.

33. The altered, fabricated post was designed to create the false impression that Plaintiff endorsed, celebrated or expressed satisfaction with Mr. Kirk's death, when in fact, Plaintiff had done no such thing.

34. The former student disseminated this fabricated, defamatory content through APSU's internal communication platform, 'Govs Connect', thereby exposing APSU faculty, staff and administrators to materially false information about Plaintiff's speech.

35. As a result, members of APSU's faculty and administration were exposed to materially false information regarding Plaintiff's speech.

36. The fabricated post generated widespread attention both within APSU and with external media coverage. Media outlets published articles referencing a tenured APSU professor's purported statement, though the statements attributed to Plaintiff were based on the fabricated mosaic post rather than Plaintiff's actual Facebook post.

**E. SENATOR BLACKBURN'S PUBLIC INTERVENTION AND COERCIVE CAMPAIGN**

37. On or about September 11 or 12, 2025, in response to media coverage of the fabricated post, Defendant Blackburn posted a public statement on her social media account (X, formerly Twitter) directly referencing the APSU professor controversy and directing coercive pressure at APSU.

38. Defendant Balckburn's public post stated, in substance, "What do you say, @austinpeay" tagging and addressing APSU directly, thereby publicly calling upon APSU to take action against the professor- Plaintiff- who had been identified in media reports. *See* Exhibit No. 2, Blackburn Post.

39.     Defendant Blackburn's statement was not legislative communication, did not involve debate or consideration of proposed legislation and was not part of any legislative function. Instead, Defendant used her official position, authority and public platform as a United States Senator to publicly pressure a state educational institution to take punitive employment action against a specific individual based on that individual's protected speech.

40.     Defendant Blackburn also publicly disseminated a screenshot of Plaintiff's picture and contact information thereby amplifying the targeting of Plaintiff and signaling to her followers and the public that retributive actions should be directed at Plaintiff personally.

41.     Defendant Blackburn's communications were widely disseminated across social media and traditional media. Her posts reached hundreds of thousands or millions of viewers, including APSU administrators, Tennessee state officials, APSU donors, alumni and members of the public.

42.     Defendant Blackburn's public statements constituted a clarion call for punitive action against Plaintiff.  Her communications were intended to, and did in fact, place substantial coercive pressure on APSU to terminate or otherwise discipline Plaintiff in retaliation for his speech.

43.     APSU is a public institution that depends on federal and state funding for its operations. Actions and public statements by influential federal and state political figures, including United States Senators, directly affect APSU's financial and institutional interests. APSU administrators were acutely aware that Defendant Blackburn, as a United States Senator representing Tennessee, wielded significant influence over federal appropriations, state political support and public perception of the university.

44.     Defendant Blackburn's conduct was undertaken in her capacity as a government official exercising the authority and influence of her office. Her actions were taken under color of law

because she employed the power, prestige and coercive authority of her federal office to induce a state entity to deprive Plaintiff of his constitutional rights.

### F.     APSU's RESPONSE AND PLAINTIFF'S TERMINATION

45.     At approximately noon on September 12, 2025, within hours of Defendant Blackburn's public posts, the Dean of APSU's College of Arts & Letters contacted Plaintiff and directed him to attend an urgent meeting with university leadership.

46.     Plaintiff attended the meeting, which included the Dean, the interim Chair of the Department of Theatre & Dance, and APSU's Provost, Dr. Mitchell Cordova.

47.     During that meeting, Provost, Dr. Cordova, informed Plaintiff, for the first time, of the existence of the fabricated mosaic post that had been circulated on APSU's internal 'Govs Connect' system.

48.     Provost Cordova explicitly acknowledged that APSU was under external pressure including coercive pressure from Defendant Blackburn to take action against Plaintiff. Provost Cordova stated that he was being pressured to address the situation by government actors who have direct influence over funding for APSU.

49.     Provost Cordova acknowledged that APSU had deleted the fabricated mosaic post from 'Govs Connect' in an effort to prevent further targeting of APSU's faculty.

50.     Plaintiff was instructed to submit a written statement explaining his knowledge of the events, and Plaintiff complied. Plaintiff's written statement was shared with university leadership.

51. At the conclusion of the meeting, Plaintiff, the Dean and the Chair believed the matter was resolved and that no further action would be taken.

52. Shortly after the meeting, Plaintiff received threatening communications directed at him because of the public attention to his speech. Plaintiff reported these safety concerns to APSU leadership.

53. On the evening of September 12, 2025 – the same day at the meeting- Provost Cordova directed Plaintiff to review an email in his inbox. That email informed Plaintiff that his employment with APSU was terminated effective immediately.

54. Plaintiff was terminated without prior notice, without a hearing and without opportunity to respond to charges or contest the grounds for termination. APSU's actions violated the procedural protections afforded to tenured faculty under APSU's tenure policies and under established constitutional due process principles.

55. APSU publicly stated that Plaintiff's termination was based on his speech. In a public statement issued on or about September 12, 2025, APSU President Dr. Michael Licari indicated that Plaintiff was fired because of the content of his Facebook post *See* Exhibit No. 3, Termination Letter.

56. APSU provided Plaintiff's personal information, including the home address where he lived with his spouse and minor child to at least one media outlet. That media outlet published Plaintiff's home address through its widely viewed network, resulting in increased harassment and safety concerns for Plaintiff and his family.

## G. ACKNOWLEDGEMENT OF PROCEDURAL VIOLATIONS AND CONTINUED RETALIATION

57. On September 18, 2025, APSU's Faculty Senate convened a meeting. During that meeting, APSU administrator acknowledged that APSU had failed to follow required procedures for terminating a tenured faculty member.

58. On or about September 18, 2025, during a meeting at APSU, an administrator, specifically, APSU President Dr. Michael Licari, stated that the prevailing political climate required "uncomfortable tradeoffs" and explicitly identified Plaintiff's loss of employment as one such tradeoff necessitated by political pressure.

59. At or around this same time, APSU was actively seeking political and financial support for planned capital projects, including building renovations and infrastructure improvements. APSU administrators were motivated to maintain favorable relationships with influential political actors, including Defendant Backburn, to secure funding and political support for the university.

60. On or about September 22, 2025, APSU informed Plaintiff by letter that he was reinstated to his position but simultaneously placed on suspension pending formal termination proceedings purportedly consistent with policies governing tenured faculty.

61. On September 23, 2025, an APSU spokesperson publicly stated that the university had initiated procedures to terminate Plaintiff for cause.

62. The initiation of termination proceedings, following Plaintiff's brief "reinstatement", was a constitution of the retaliation against Plaintiff for his protected speech and was undertaken in response to the same coercive pressure from Defendant Blackburn.

63. Plaintiff's post about Mr. Kirk was speech concerning matters of public concern, including public safety and constitutional rights, and did so as a private citizen rather than pursuant to his official job duties and that speech was chilled.

## H. HARMS TO PLAINTIFF AND HIS FAMILY

64. As a direct and proximate result of Defendant Balckburn's coercive campaign and the resulting adverse employment actions by APSU, Plaintiff has suffered severe harm, including but not limited to:

    a. loss of employment, income and employment benefits, including health insurance and retirement contributions;

    b. loss of professional reputation within his academic and the broader community;

    c. severe emotional distress, including anxiety, panic attacks, fear for his personal safety and the safety of his family, humiliation and ongoing psychological trauma;

    d. chilling of his willingness and ability to engage in protected speech on matters of public concern;

    e. harassment, threats and intimidation directed at Plaintiff and his family necessitating changes to personal contact information and living arrangements.

65. Plaintiff's spouse, who remains employed at APSU, has been subjected to an intimidating and hostile work environment because of the events described herein, Plaintiff's spouse has experienced increased sick leave, medical expenses and emotional distress directly caused by Defendant's actions and APSU's response.

66. Plaintiff's minor child has suffered serious emotional distress and harm as a result of the targeting, harassment and public vilification of Plaintiff and the threats directed at the family.

67. Following Plaintiff's termination on September 12, 2025, Plaintiff was denied access to his professional computer systems, email accounts, personal records and years of professional data. Although Plaintiff subsequently regained systems access, thousands of emails and records were permanently destroyed, resulting in irreparable loss of scholarly work, correspondence and professional materials.

68. Upon information and belief, flyers targeting Plaintiff and his protected speech were distributed on APSU's campus, contributing to a hostile, intimidating and retaliatory environment.

69. Following Plaintiff's removal, APSU's Department of Theatre & Dance experienced deterioration and deterioration, including staff departures and the cancellation or diminishment of planned performances and events. Other departments and programs similarly lost alumni and financial support.

70. Plaintiff received threatening and harassing phone calls through the spring of 2026. As a result, Plaintiff was forced to change his phone number and maintain it in an unlisted manner. Plaintiff's previous phone number was subsequently assigned to another APSU faculty member who also received harassing phone calls on that number.

71. Plaintiff and his family have incurred substantial medical and counseling expenses related to the trauma, anxiety and emotional distress caused by Defendant's conduct and the resulting adverse actions.

## I. DEFENDANT'S LIABILITY AND CONDUCT UNDER COLOR OF LAW

72. Defendant Blackburn acted under color of law within the meaning of 42 U.S.C. § 1983 when she used the authority, influence and coercive power of her office as a United States Senator to pressure APSU, a public state institution, to take adverse action against Plaintiff in retaliation for his constitutionally protected speech.

73. Defendant Blackburn conduct was not legislative in nature and is not protected by legislative immunity. She did not engage in debate, voting, committee work or any other function integral to the legislative process. Instead, she undertook targeted, individualized and coercive efforts to cause punitive employment action against a specific private citizen because of his protected expressive activity.

74. Defendant Blackburn's actions were intended to, and did in fact, cause APSU to take adverse employment actions against Plaintiff, including immediate suspension, public vilification, and initiation of termination-for-cause proceedings.

75. Defendant Blackburn's public statements and coercive pressure were the direct, substantial and proximate cause of APSU's retaliatory actions against Plaintiff. But for Defendant's intervention, APSU would not have terminated Plaintiff or subjected him to the adverse actions described herein.

76. The adverse actions taken against Plaintiff-public termination, vilification, suspension, disclosure of personal information and initiation of formal termination proceedings- would deter a person or ordinary firmness from engaging in constitutionally protected speech.

77. Plaintiff's protected speech was a substantial and motivating factor in the adverse actions taken against him by APSU in response to Defendant Blackburn's coercive campaign.

78. Defendant Blackburn's conduct constituted political coercion designed to punish Plaintiff for engaging in protected speech and to influence institutional action outside the legislative process. Her conduct violated clearly established constitutional rights of which a reasonable official would have known.

79. By the actions described herein, Defendant Blackburn deprived Plaintiff of rights, privileges and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

## CAUSES OF ACTION

### COUNT I: FIRST AMENDMENT RETALIATION (42. U.S.C. § 1983)

80. Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

81. The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, protects public employees' rights to speak as citizens on matters of public concern, free from retaliation by government actors.

82. Plaintiff engaged in speech protected by the First Amendment. Specifically, Plaintiff posted a comment on his private Facebook account addressing gun violence, public safety, the Second Amendment and the tragic irony of Charlie Kirk's death in light of his prior public statements-all matters of significant public concern.

83. Plaintiff spoke as a private citizen, not pursuant to his official duties as a professor. The Facebook post was made on Plaintiff's personal social media account, did not involve his reaching or academic responsibilities, did not reference APSU, and was wholly unrelated to his employment.

84. Plaintiff's interest in commenting on matters of public concern- gun violence, public safety, and constitutional rights- substantially outweighed any interest APSU might claim in restricting such speech. Plaintiff's speech caused no disruption to APSU's operations, did not interfere with is teach and did not compromise professional relationships. The only disruption resulted from Defendant Blackburn's coercive intervention and APSU's unlawful retaliatory response.

85. Defendant Blackburn took adverse action against Plaintiff by publicly pressuring APSU to terminate him and by disseminating Plaintiff's personal information to facilitate targeting and harassment. APSU, responding to Defendant's coercive pressure, terminated Plaintiff, publicly vilified him, disclosed his personal information and initiated formal termination-for-cause proceedings.

86. These adverse actions would deter a person of ordinary firmness from continuing to engage in protected speech.

87. There is a clear causal connection between Plaintiff's protected speech and the adverse actions against him. Defendant Blackburn's public posts explicitly referenced the professor's controversy and called for APSU to act. APSU administrators explicitly acknowledged that they were responding to external political pressure, including pressure from Defendant Blackburn. APSU publicly stated that Plaintiff was terminated because of his speech. Plaintiff's protected speech was a substantial motivating factor- indeed, the sole factor- in Defendant's campaign and APSU's retaliatory actions.

88. Defendant Blackburn's conduct also constituted viewpoint discrimination. Defendant targeted Plaintiff's speech not merely because of its subject matter but because of the perspective it expressed. Speech supporting Mr. Kirk's views on gun rights, or mourning his death without referencing his prior statements, was not targeted for retribution. Defendant singled out Plaintiff because his post implicitly critiqued the consequences of widespread gun violence- a viewpoint at odds with Defendant's political preferences. Viewpoint-based restrictions on speech are subject to strict scrutiny and are presumptively unconstitutional.

89. Defendant Blackburn is not entitled to qualified immunity. The law was clearly established at the time of her conduct that government officials may not retaliate against individuals for

engaging in protected speech on matters of public concern. A reasonable official in Defendant's position would have known that using her official authority and platform to coerce a public university to terminate a professor because of his private speech on a matter of public concern violated the First Amendment.

90. As a direct and proximate result of Defendant Blackburn's conduct, Plaintiff has suffered and continues to suffer substantial damages, including loss of employment and income, loss of professional reputation , sever emotional distress and violation of his constitutional rights.

91. Plaintiff is entitled to declaratory, injunctive and damages monetary relief under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), as well as attorney fees and costs under 42 U.S.C. § 1988.

## COUNT II: TORTIOUS INTERFERENCE OF CONTRACT

92. Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

93. At all relevant times, Plaintiff was employed by APSU as a tenured professor under an employment contract that afforded his substantive and procedural protections against terminations.

94. Defendant Blackburn knew or should have known that Plaintiff was a tenured college professor at APSU, a public university in the state she represents, and therefore and, therefore, that Plaintiff had an existing employment contract with APSU that included tenure protections.

95. Defendant Blackburn intentionally and unjustifiably interfered with Plaintiff's employment contract by publicly pressuring APSU to terminate Plaintiff's employment.

96. Under APSU's policies governing tenure, tenured professors may be terminated only for financial exigency, curricular reasons, or adequate cause, and only after notice or hearing. APSU

cited none of these reasons when terminating Plaintiff on September 12, 2025. APSU followed none of the required procedures.

97. Expressing personal views on a matter of great public concern on one's private social media account is not adequate cause for termination of a tenured professor under APSU's policies or under any reasonable interpretation of academic freedom and tenure protections.

98. As a direct and proximate result of Defendant's tortious interference, Plaintiff has suffered substantial damages, including loss of employment, income, benefits, professional reputation and emotional distress.

99. Plaintiff is entitled to declaratory, injunctive and monetary relief because Defendant Blackburn unjustifiably induced APSU to breach Plaintiff's employment contract by wrongfully terminating him.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

100. Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

101. Defendant Blackburn intentionally engaged in extreme and outrageous conduct by publicly pressuring APSU to terminate Plaintiff in the immediate aftermath of a high-profile violent killing that had sparked intense national outrage and social tension.

102. Defendant Blackburn was aware of the astronomically high political and social tensions surrounding the Charlie Kirk killing. She knew or should have known that publicly targeting an individual professor, disseminating his personal information and calling for his termination in such a volitive climate would subject that individual and his family to harassment, threats and extreme emotional distress.

103. Defendant Blackburn intentionally and recklessly disregarded the foreseeable consequences of her conduct. She acted with knowledge that her public campaign would cause

APSU to terminate Plaintiff hastily and publicly, and that termination would be widely covered by the media, thereby exposing Plaintiff to vilification, harassment and threats.

104. Defendant's conduct was extreme and outrageous. It exceeded all bounds of decency tolerated in a civilized society. Using the power and platform of a United States Senate office to orchestrate the public termination of a private citizen for engaging in constitutionally protected speech, during a national tragedy and heightened tensions, constitutes conduct so egregious as to be intolerable.

105. As a direct and proximate result of Defendant Blackburn's intentional and outrageous conduct, Plaintiff and his immediate family have suffered severe emotional distress, including extreme anxiety, panic attacks, fear of their physical safety, humiliation, sleeplessness and ongoing psychological trauma.

106. Plaintiff received threatening calls through the spring of 2026, requiring him to change his phone number and take other measures to protect his family's safety. Plaintiff's previous number was assigned to another faculty member who also received harassing phone calls on that number.

107. As a result of this emotional distress, Plaintiff and his family have incurred substantial medical and counseling expenses as a result of the trauma, mental and emotional distress caused by the Defendant's conduct.

108. Plaintiff is entitled to declaratory, injunctive and monetary relief because Defendant Blackburn intentionally inflicted emotional distress on Plaintiff by pressuring his public employer to terminate him in such public fashion in the wake of great violence.

## COUNT IV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

109. Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

110. Defendant Blackburn owed Plaintiff a duty to exercise reasonable care in her public statements and actions and not to subject him to unreasonable risk of harm.

111. Even if Defendant Blackburn did not intend the full extent of her harm that befell Plaintiff and his family, she knew or should have known that publicly targeting an individual professor, disseminating his personal information and pressuring his employer to terminate him in the immediate aftermath of a violent national tragedy would foreseeably cause severe emotional distress, harassment and threats.

112. Defendant Balckburn breached her duty of care by acting in a reckless disregard of the foreseeable consequences of her conduct.

113. Defendant Blackburn placed Plaintiff and his family within a zone of danger. Her public dissemination of Plaintiff's personal information and her public call for retributive action foreseeably exposed Plaintiff to harassment, threats and physical danger.

114. As a direct and proximate result of Defendant Blackburn's negligent conduct, Plaintiff and his immediate family have suffered serious emotional distress, including anxiety, panic attacks, fear for their physical safety, humiliation, and ongoing psychological harm.

115. Plaintiff and his family have incurred substantial medical and counseling expenses because of the emotional distress negligently caused by Defendant's conduct.

116. Plaintiff is entitled to declaratory, injunctive and monetary relief because Defendant Blackburn negligently inflicted emotional distress on Plaintiff by pressuring his public employer to terminate him in such a public fashion in the wake of great violence.

## PUNITIVE DAMAGES

117.    At all material times, Defendant Blackburn acted intentionally, willfully, wantonly and maliciously, in depriving Plaintiff of his constitutional rights and causing him harm.

118.    Defendant Blackburn's conduct constituted willful and wanton disregard for Plaintiff's constitutional rights, safety and well-being.

119.    Defendant Blackburn acted with malice, in that her actions were motivated by ill will, personal or political animus and a desire to punish Plaintiff for speech that did not align with her political preferences.

120,    Defendant Blackburn's conduct was contrary to  public welfare and unconscionable.  She was aware that her actions would deprive Plaintiff of his free-speech rights guaranteed by the Constitution of the United States and Tennessee and yet she acted deliberately and with reckless indifference to those rights.

121.    Defendant Blackburn's conduct was undertaken with the specific intent to harm Plaintiff and to deter others from engaging in speech critical of gun violence or inconsistent with Defendant's political ideology.

122.    Punitive damages are warranted to punish Defendant for her egregious conduct and to deter her and other government officials from engaging in similar unconstitutional retaliation in the future.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant Blackburn and grant the following relief:

1. **Declaratory Relief**: a declaration that Defendant Blackburn's conduct violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution under Article I, Section 19 of the Tennessee Constitution.

2. **Injunctive Relief**: A permanent injunction prohibiting Defendant Blackburn from further retaliation against Plaintiff or interfering with his employment or constitutional rights.

3. **Compensatory Damages**: An award of compensatory damages in an amount determined at trial, including:
   - Lost wages, back pay and front pay
   - Lost employment benefits
   - Damages for emotional distress, mental anguish, humiliation and suffering
   - Medical and counseling expenses
   - Reputational harm and loss of professional standing
   - All other economic and non-economic damages sustained by Plaintiff as a direct and proximate result of Defendant's unlawful conduct.

4. **Punitive Damages**: An award of punitive damages in an amount sufficient to punish Defendant for her willful, wanton and malicious conduct to deter similar conduct in the future.

5. **Attorney Fees and Costs**: An award of reasonable attorney's fees and costs pursuant to 42 U.S.C. 1988 and as otherwise permitted by law.

6. **Interest**: Pre-judgment and post-judgment interest as allowed by law.

7. **Such Other Relief**: Such other and further relief as this Court deems just, equitable and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues so triable.

DATE: August 2, 2026

Respectfully Submitted:

/s/ David L. King
David L. King, BPR #07311
TENNESSEE LAW GROUP
1300 Division Street
Nashville, TB 37203
(615) 742-5373
david@mylawyertennessee.com

/s/ Meggan B. Sullivan
Meggan B. Sullivan, BPR #33067
410A 37th Avenue North
Nashville, TN 37209
(615) 457-0449
megganbsullivan@gmail.com

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual allegations set forth above are true and correct to the best of my knowledge, information and belief.

/s/ Darren Michael

24

Case 3:26-cv-01122   Document 1   Filed 08/07/26   Page 24 of 24 PageID #: 24